FILED

09/28/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2018 Session

## STATE OF TENNESSEE v. TERRY PATTERSON

**Appeal from the Criminal Court for Shelby County**
**No. 16-00715       Carolyn W. Blackett, Judge**

_____

## No. W2017-01481-CCA-R3-CD

_____

The Defendant, Terry Patterson, was convicted by a Shelby County Criminal Court jury of aggravated child abuse, a Class A felony, in Count 1; voluntary manslaughter, a Class C felony, in Count 2; aggravated child neglect, a Class A felony, in Count 3; second degree murder, a Class A felony, in Count 4; and aggravated child endangerment, a Class A felony, in Count 5. He was sentenced to twenty-five year terms for the aggravated child abuse, aggravated child neglect, aggravated child endangerment, and second degree murder convictions, and six years for the voluntary manslaughter conviction. The court ordered that the sentences for the aggravated child abuse, aggravated child neglect, and aggravated child endangerment convictions be served concurrent with each other but consecutive to the sentences for the second degree murder and voluntary manslaughter convictions, which were ordered to be served concurrent with each other, for an effective term of fifty years in the Department of Correction. On appeal, the Defendant argues that: (1) the evidence is insufficient to sustain his convictions; (2) his convictions for second degree murder and voluntary manslaughter should be merged, as should his convictions for aggravated child abuse, aggravated child neglect and aggravated child endangerment; and (3) the trial court erred in imposing partial consecutive sentences. After review, we modify the Defendant's conviction for voluntary manslaughter in Count 2 to reckless endangerment and impose a sentence of four years for that conviction, the judgment of which should indicate the merger of Count 2 into Count 4; reverse the Defendant's conviction for aggravated child endangerment in Count 5; and remand for entry of a corrected judgment in Count 4 to indicate the merger of Count 2 into Count 4. We affirm the trial court's judgments in all other regards.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, Modified in Part and Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Stephen C. Bush, District Public Defender; and Tony N. Brayton (on appeal), Mary K. Kent (at trial), and Phillip Harvey (at trial), Assistant Public Defenders, for the appellant, Terry Patterson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Carrie Shelton and Josh Corman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Defendant was indicted on five different charges related to the beating death of his three-year-old son: aggravated child abuse in Count 1, first degree murder during the perpetration or attempt to perpetrate aggravated child abuse in Count 2, aggravated child neglect in Count 3, first degree murder during the perpetration or attempt to perpetrate aggravated child neglect in Count 4, and aggravated child endangerment in Count 5.

At trial, Kerra Brown, the victim's mother, testified that she and the Defendant, the victim's father, had previously been in a relationship. They shared custody of the victim, alternating weeks, and at the time in question the victim was staying with the Defendant. Ms. Brown said that on September 4, 2015, the Defendant called her to express that the victim was not eating. Ms. Brown talked to the victim on the phone but agreed to come over and talk to the victim in person.

Ms. Brown arrived at the Defendant's apartment around 5:00 p.m. She recalled that the victim was fully clothed and that the Defendant "was acting like he was pissed off about something," complaining that the victim would not eat. Ms. Brown repeatedly told the victim that he needed to eat, but he refused. There was a McDonald's Happy Meal on the table and, although the victim would eat the French fries, he would only chew the hamburger but not actually eat it. Ms. Brown said that the victim was a "picky" eater.

Ms. Brown stated that she partially pulled down the victim's pants and spanked his bottom twice with the Defendant's belt. She explained that she spanked the victim because he was being disobedient by not following the Defendant's order to eat. The victim did not cry after the spanking. Ms. Brown told the victim to "be strong" and eat, and he did so. The victim kept saying that he wanted to tell Ms. Brown something, but

he never did despite her asking and him following her outside crying at one point. Ms. Brown recalled that the Defendant was close by the entire time she was at his apartment.

Ms. Brown noted that the longer she stayed at the apartment, the more upset the Defendant looked and acted. She determined that it was time for her to leave because the victim was "good" and "[w]hatever [the Defendant] [was] mad about [had] . . . nothing to do with [her] or [her] son." She recalled that, as she was leaving, the Defendant made a remark that he and Ms. Brown should get back together. He also asked to have sex with Ms. Brown, but she refused. When Ms. Brown left, the victim was walking and talking in a normal manner. She did not detect the smell of vomit or of the victim defecating on himself.

Ms. Brown testified that she was awakened during the night by a phone call from the Defendant telling her to go to the hospital because the victim was dead. He told her that her "whooping" of the victim caused his death. Upon seeing the victim at the hospital, Ms. Brown observed that his body looked "swollen." He had a black eye, and marks on his head and lips that were not there earlier in the evening. Ms. Brown did not see the Defendant at the hospital.

Regina Watkins testified that she was the Defendant's long-time girlfriend in September 2015 and the two were living together. Ms. Watkins took care of the victim the morning of September 4th until the Defendant came home from work around noon. Ms. Watkins left shortly before 3:00 p.m. to avoid running into Ms. Brown. When she left, the victim was fully clothed and acting like "a normal little boy eating." The victim had no injuries or marks on his body. The Defendant was "in a normal mood."

Ms. Watkins recalled that the Defendant left the victim home alone and picked her up from work around 11:00 p.m. that night. When they got home, she saw the victim lying naked on the couch and noticed a spot or bruise on his forehead. She smelled "a stench like vomit" in the home and noticed a stain on the other couch, but she did not see any vomit on the victim. Ms. Watkins noted that it was normal for the victim to sleep only in his underwear because he did not have a change of clothes in the home, but the victim did not have on any underwear. She thought she saw the victim's underwear and jeans, as well as the Defendant's belt, in the corner by the couch. Ms. Watkins kissed the victim and told him goodnight. The victim said, "night-night step mom," and Ms. Watkins went to the bedroom.

Ms. Watkins testified that she asked the Defendant about the bruise on the victim's head. The Defendant told her that he had "whooped" the victim because "he didn't want to eat his food and . . . threw up on the couch," and the victim fell and hit his head. Ms. Watkins assumed that the victim must have hit his head on the edge of the coffee table.

- 3 -

Ms. Watkins informed the Defendant that the victim, having sustained a head injury, should be taken to the hospital and not allowed to go to sleep. The Defendant asserted that it was just a bruise and went to bed without checking on the victim. Ms. Watkins heard the victim cough twice and went in to check on him at 2:05 a.m. However, Ms. Watkins thought that the victim was just suffering from his usual nasal congestion.

Ms. Watkins testified that the Defendant got up for work at 4:30 a.m., and she heard him say goodbye to the victim as he prepared to leave. The Defendant then yelled for her, exclaiming that the victim was not breathing. She went and checked on the victim; he was not moving and his eyes were "rolled in the back of his head." Ms. Watkins called 911 and followed their orders for performing CPR until help arrived. The Defendant was by her side, giving assistance. When the ambulance arrived, Ms. Watkins rode with the victim in it to the hospital. She thought the Defendant was going to follow the ambulance in his car, but she never saw him at the hospital.

After the victim was pronounced dead, Ms. Watkins was taken to the police station and she told them what the Defendant had said about how the victim sustained a bruise on his head. She identified a photograph of the victim's head and face on which she had circled the bruise and wrote that "[the Defendant] is responsible for [the victim]'s death."

On cross-examination, Ms. Watkins claimed that she gave a statement because the police threatened her. She said that the part of her statement about kissing the victim when she got home was true, but she did not recall much else because she had been drinking. She said that it was true she saw a bruise on the victim's head and told the Defendant that he needed to take the victim to the hospital. The only untrue thing she told the police was that she saw something on the victim's scalp. She maintained both on cross-examination and redirect examination that the Defendant told her that he hit the victim and the victim fell.

Firefighter-Paramedic Michael Dobrzeniecki responded to the 911 call. He saw Ms. Watkins standing over the naked toddler, trying to perform CPR. The victim was not breathing and did not have a pulse. Mr. Dobrzeniecki tried to get information from Ms. Watkins and the Defendant regarding the possible cause for the victim's status, but both were acting "standoffish" and "like they didn't care." Mr. Dobrzeniecki could not get much more information from them other than the victim's name and age, and that Ms. Watkins last saw him alive around 2:30 a.m.

Paramedics moved the victim to the ambulance, and Mr. Dobrzeniecki detailed the life-saving measures they undertook trying to save him. Under the brighter lighting in the ambulance, Mr. Dobrzeniecki saw that the victim had bruising and swelling to his left

- 4 -

eye and cylindrical-shaped bruising on his abdomen going down the right hip and leg, indicators that the victim had been abused. Mr. Dobrzeniecki stated that normally a family member would ride in the ambulance with the patient, but in this case Ms. Watkins rode with them.

Dr. Amy Hertz, the emergency room doctor who tried to save the victim, testified that the victim was "bruised all over." She saw no scars on his body that would have indicated any prior surgeries, so she suspected that he had "been beaten." She noted that the victim had "significant bruising especially around [his] left eye and on his forehead" and also around his nose. There were multiple bruises on the victim's torso, indicating "significant trauma at the hand of somebody." Dr. Hertz discussed the victim's other injuries and detailed the life-saving measures she took trying to save him. Dr. Hertz opined that a child would not die from a head injury received by merely running and falling down.

Dr. Hertz testified that a child with a subdural bleed could be saved, but they would have to be aware that he or she had suffered a head injury. She said that in a three year old, a subdural bleed of 14 centimeters by 6 centimeters would be "huge." She would not expect for a child of that age with a subdural bleed of that size to be able to walk. She would expect the child to be sleepy, throwing up, and unable to function normally. There would also be the danger that the child would aspirate vomit into his or her lungs, which could be deadly. She would expect that the child would not be able to talk, but instead, "make incomprehensible sounds."

Dr. Hertz testified that a head injury that involved a subdural bleed of 14 centimeters by 6 centimeters would be "very painful" up until the point of unconsciousness, and then the victim would stop breathing. A subdural bleed of that size would require medical intervention to survive. However, Dr. Hertz said that a child who survived such a subdural bleed would suffer "significant consequences" like learning disorders or cerebral palsy.

Dr. Paul Benson conducted the autopsy of the victim. Dr. Benson documented the victim's external injuries, noting that he had to use several different diagrams because he "couldn't get all the injuries on the one diagram." The doctor observed abrasions, bruises and contusions on the victim's face, jaw, ears, eyes, chest, abdomen, back, thighs, pelvis, buttocks, genitals, arms and hands. Some of the bruising on the right side of the victim's abdomen and right thigh was in a looped-type pattern. The victim's testicles exhibited hemorrhaging, indicative of blunt force trauma. Dr. Benson surmised that the injuries to the victim's arms were consistent with defensive wounds – "injury trying to ward off a blow." The doctor's investigation of the victim's internal wounds revealed "bleeding in the tissue . . . consistent with a . . . closed fist punch" from an adult.

- 5 -

Dr. Benson testified that although the victim suffered extensive external injuries, none of those would have been fatal. Rather, it was the damage to the victim's skull and brain that killed him. Dr. Benson's internal examination of the victim's head and skull revealed a subdural hematoma, or intracranial bleeding, measuring 14 centimeters by 6 centimeters and weighing 26 grams. The injury caused the brain to swell, which deprived the brain of oxygen and led to the cessation of brain function. Dr. Benson noted that the injured side of the brain forced its way into the uninjured side of the brain. It was the doctor's opinion that if untreated, and "many times even if it is treated," such swelling would lead to death. Dr. Benson said that there could be pain associated with the hematoma, along with decreased levels of consciousness, confusion, impaired use of extremities, and decreased respiratory and heart rates. Nausea and vomiting could also occur. The ability to walk and talk could be affected.

Dr. Benson testified that the victim's head showed multiple blunt force trauma impacts with bruising "on all the surfaces of the head, on the face, on the left side of the scalp, on the right side of the scalp, on the front of the scalp and on the back of the scalp[.]" The injuries Dr. Benson observed were consistent with the victim's being punched and hit with a belt. Dr. Benson opined that with a subdural hematoma the size of that seen in the victim, the victim would have "quickly" become incapacitated and unable to walk. Dr. Benson determined the cause of the victim's death to be blunt force injuries to the head.

Detective Michael Spearman with the Memphis Police Department was assigned to conduct the initial interview of the Defendant. The Defendant was told that he was not under arrest. Detective Spearman described the Defendant as "very cool, calm, mild, collective," but he "was leaning forward kind of like in a worried motion." The Defendant expressed concern about his son and asked about his girlfriend and the victim's mother. Detective Spearman recalled that the Defendant asked if the interview room he was in was the same one used in the television show "First 48."

Detective Spearman stated that the Defendant told him that he was "still married to [his] wife and [they] ha[d] five children together. Then [he] ha[d] one outside child, which is [the victim]." The Defendant said that he had recently been awarded shared custody of the victim, and the victim was staying with him at the time in question. However, the victim would not eat or use the bathroom, so he called the victim's mother to come over and talk to him. The Defendant told Detective Spearman that he went to the store when the victim's mother arrived, but he thought the victim's mother "whooped" the victim although he did not know for sure. The Defendant said that he told the victim's mother that she was the one who needed to discipline the victim because he was not going to "whoop" the child.

The Defendant told Detective Spearman that when he got home from the store, the victim was lying down in bed under the covers and "everything with him looked pretty straight." The Defendant said that his girlfriend got home later and they heard the victim coughing sometime during the night. The Defendant's girlfriend checked on the victim and called 911 because she thought that he was not breathing. Detective Spearman recalled that the Defendant's demeanor during the interview was very calm but worried. Detective Spearman sat in on a second interview of the Defendant conducted by Detective Fausto Frias later the same day. The Defendant's demeanor was still "pretty calm" during the second interview, but he banged on the table a couple of times and "was a little angry" after being shown photographs of the victim.

Detective Fausto Frias with the Memphis Police Department testified that he had the Defendant; the Defendant's girlfriend, Regina Watkins; the victim's mother, Kerra Brown; and the victim's mother's boyfriend all brought in for questioning. He recalled that the Defendant was calm and cooperative when he explained the investigative process. After Detective Frias spoke with the medical examiner and had the witnesses interviewed by other officers, he personally interviewed the Defendant. The Defendant initially told him that "[h]e didn't have any idea of how those injuries were there. And he denied being responsible for the injuries." When Detective Frias confronted the Defendant with Ms. Watkins's statement, the Defendant "became emotional" and "nervous." Detective Frias then showed the Defendant photographs of the victim, and the Defendant "became real emotional" and said, "I did that to my son. I'm not a killer. I love him." The Defendant gave a statement explaining that he became angry when the victim spit out his food and urinated and defecated on himself. He admitted that he "went overboard" and beat the victim with his hands and a belt. The Defendant also said that the victim had referred to Ms. Brown's boyfriend, rather than the Defendant, as his father.

In his statement, the Defendant recounted that the victim refused to eat from the time he picked up the victim on Sunday afternoon until Friday, when the Defendant got ahold of Ms. Brown to have her speak to the victim about the importance of eating. Ms. Brown also came over and spoke to the victim in person. The Defendant said that Ms. Brown "hit [the victim] and whip[ped] him with the belt." The Defendant recounted that after Ms. Brown left, the victim "threw up all over the table. I then slapped him across his face and he bumped his head into the doorway. I picked him back up and hit him twice in the head with my fist and then I took a belt and finished whipping him with the belt." The Defendant said that he then laid the victim down on the couch and left the apartment to pick up his girlfriend. When he and Ms. Watkins got home, the victim was still lying on the couch, but he checked on the victim and "he seemed to be okay." Ms. Watkins checked on the victim at 2:30 a.m. and told the Defendant that the victim was

okay.  The Defendant said, however, that the victim was not breathing when he checked on him at 4:30 a.m.

In his statement, the Defendant recalled that after he hit the victim with his fist and belt, the victim was "dazed like lame, but he was responsive."  The Defendant said that he did not take the victim to the hospital because he "wasn't thinking and . . . thought he was going to be okay."  The Defendant made notations on several photographs of the victim, signifying that he inflicted the injuries.  The Defendant ended his statement by saying that he "went overboard" and that he "need[ed] help with [his] anger so this can never happen again."

Officer Stacy Milligan, a crime scene investigator with the Memphis Police Department, took photographs of the victim's body at the hospital and then went to the crime scene where he took additional photographs and collected evidence.  Among the photographs Officer Milligan took in the Defendant's home was one of a belt and pair of Spiderman underwear on the couch, and one of a tissue with blood on it that was found on a stove in the kitchen.  He collected the tissue, underwear, belt, and some other items of children's clothing, as well as a large sofa cushion that appeared to be soiled.

The Defendant elected not to testify or present any proof.

After the conclusion of the proof, the jury convicted the Defendant of aggravated child abuse in Count 1, the lesser-included offense of voluntary manslaughter in Count 2, aggravated child neglect in Count 3, the lesser-included offense of second degree murder in Count 4, and aggravated child endangerment in Count 5.

## ANALYSIS

### I. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his convictions.  When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754

S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

### A. Aggravated Child Abuse, Neglect and Endangerment

The Defendant argues that the evidence is insufficient to sustain his convictions for aggravated child neglect and aggravated child endangerment because there is no

evidence that any neglect or endangerment on his part "produced an actual deleterious effect or harm upon the victim, separate and apart from [the] serious bodily injury relied upon to establish aggravated child abuse." Essentially, the Defendant asserts that there is insufficient proof of different forms of serious bodily injury to support convictions for aggravated child abuse, aggravated child neglect and aggravated child endangerment. Tennessee Code Annotated section 39-15-402 provides that:

> A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and . . . [t]he act of abuse, neglect or endangerment results in serious bodily injury to the child[.]

Id. § 39-15-402(a)(1).

Child abuse is defined as "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury[.]" Id. § 39-15-401(a). Child neglect is "knowingly abus[ing] or neglect[ing] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare[.]" Id. § 39-15-401(b). Child endangerment occurs when "[a] parent or custodian of a child eight (8) years of age or less . . . knowingly exposes such child to or knowingly fails to protect such child from abuse or neglect resulting in physical injury to the child." Id. § 39-15-401(c). Child abuse, neglect, or endangerment becomes aggravated when the "act of abuse, neglect or endangerment results in serious bodily injury to the child[.]" Id. § 39-15-402(a)(1). "'Serious bodily injury to the child' includes, but is not limited to . . . a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement[.]" Id. § 39-15-401(d).

Having reviewed the evidence in the light most favorable to the State, we conclude that there is sufficient evidence to establish two independent forms of serious bodily injury to support the Defendant's aggravated child abuse and aggravated child neglect convictions. We are constrained to conclude, however, that there is not additional evidence sufficient to sustain the aggravated child endangerment conviction.

As to aggravated child abuse, the Defendant admitted to whipping the victim with his belt. The medical examiner, Dr. Benson, testified that the victim was covered in bruises from head to toe and had suffered multiple blows to the head. The victim also suffered blunt force trauma to his testicles. Dr. Benson noted that the victim's abdominal bruises exhibited a "looped" pattern. Dr. Benson opined that the victim's injuries were consistent with his being punched and hit with a belt. Dr. Benson's internal examination

of the victim's head and skull revealed a subdural hematoma, or intracranial bleeding, measuring 14 centimeters by 6 centimeters and weighing 26 grams. The injury caused the brain to swell, which deprived the brain of oxygen and ultimately led to the cessation of brain function. The emergency room physician, Dr. Hertz, testified that the victim had significant bruising, especially around his left eye, forehead, and around his nose. She also noted multiple bruises on the victim's torso. Dr. Hertz stated that a subdural bleed the size of the victim's would be considered "huge." Dr. Hertz summarized that the victim was "bruised all over" and had sustained "significant trauma at the hand of somebody." There is sufficient evidence for a rational trier of fact to find the Defendant guilty of aggravated child abuse.

As to aggravated child neglect, the proof established that a subdural bleed the size of the victim's would require medical attention but could be survivable, and that the Defendant's delay in seeking medical treatment posed a substantial risk of death. It is undisputed that the victim did not move from the time Regina Watkins arrived home at 11:00 p.m. until 911 was called around 4:30 a.m. Ms. Watkins testified that when she got home, she saw a bruise on the victim's head and told the Defendant that he should seek medical attention for the victim, but the Defendant took no action. According to the testimonies of Dr. Hertz and Dr. Benson, a victim with a subdural bleed like the victim's would not be able to walk or function normally, and would be sleepy and possibly vomit. Such a victim would also have decreased levels of consciousness, confusion, and impaired use of extremities. Dr. Benson opined that with a subdural hematoma the size of that seen in the victim, the victim would have "quickly" become incapacitated. From this proof, a reasonable trier of fact could have determined that the Defendant could not help but know that the victim needed medical treatment and knowingly neglected the victim by delaying medical treatment, which produced an actual deleterious effect or harm upon the victim. There is sufficient evidence to sustain the Defendant's conviction of aggravated child neglect.

In sum, the beating of the victim is the basis for the aggravated child abuse conviction and the failure to seek timely medical treatment is the basis for the aggravated neglect conviction. See State v. Joshua R. Starner and Caitlyn Metz, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *27-28 (Tenn. Crim. App. Apr. 20, 2016), perm. app. denied (Tenn. Aug. 18, 2016). We have thoroughly reviewed the record, however, and there is simply not enough additional distinct proof to sustain the Defendant's aggravated child endangerment conviction.

**B. Second Degree Murder and Voluntary Manslaughter**

As laid out above, the Defendant was convicted of second degree murder as a lesser-included offense of first degree murder during the perpetration or attempt to

perpetrate aggravated child neglect, and of voluntary manslaughter as a lesser-included offense of first degree murder during the perpetration or attempt to perpetrate aggravated child abuse. The Defendant argues that the evidence is insufficient to sustain these convictions.

Second degree murder is a knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20). The Defendant asserts that, at most, he acted recklessly. However, in the light most favorable to the State, there is sufficient evidence from which the jury could find that the Defendant acted knowingly. The proof showed that the Defendant beat and struck the three-year-old victim numerous times in the head. Dr. Hertz and Dr. Benson both testified that the severity of the victim's injuries would have been immediately apparent. Dr. Hertz testified that the victim would have been unable to walk, would be sleepy, possibly throw up and exhibit "mental status changes." Dr. Benson testified that the victim would have "quickly" become incapacitated and unable to walk. When Ms. Watkins got home and observed the victim's head injury, the Defendant ignored her suggestion that he take the victim to the hospital. Further, paramedic Michael Dobrzeniecki testified that the Defendant was unemotional at the scene, like he "didn't care." Given this proof, a reasonable trier of fact could have determined that the Defendant could not help but be aware that delaying medical treatment would be reasonably certain to cause the victim's death.

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a). The elements which distinguish voluntary manslaughter from murder are those of "adequate provocation" and "state of passion." The jury is responsible for reviewing the evidence to determine whether it supports a finding of adequate provocation. State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001). The Defendant asserts the victim's behavior, which was "normal" for "a three-year-old who is a picky eater that vomits or urinates on himself," could not constitute adequate provocation.

We agree with the Defendant. Our supreme court has held that it is "a virtual legal impossibility for a small child to commit an act that would amount to provocation sufficient to make his subsequent death voluntary manslaughter rather than murder." State v. Brown, 836 S.W.2d 530, 554 (Tenn. 1992) (finding that a four-year-old child urinating and defecating on himself was not adequate provocation for a conviction of voluntary manslaughter). More recently, this court relied on the holding in Brown to conclude that the act of an eighteen-month-old child losing a sock was insufficient provocation. State v. Edward Joseph Benesch II, No. M2015-02124-CCA-R3-CD, 2017

WL 3670196, at *16-17 (Tenn. Crim. App. Aug. 25, 2017). In the case at hand, we simply cannot conclude that the three-year-old victim's refusal to eat or urinating and defecating on himself could constitute adequate provocation sufficient to sustain a voluntary manslaughter conviction. However, the evidence is sufficient to support a conviction for the next appropriately charged lesser-included offense of reckless homicide, which is "a reckless killing of another." Tenn. Code Ann. § 39-13-215. Therefore, we modify the Defendant's conviction for voluntary manslaughter in Count 2 to reckless homicide.

Because the trial court imposed the maximum sentence for each of the Defendant's convictions, remanding for resentencing is not necessary as the record before us is sufficient to impose an appropriate sentence. See State v. Zonge, 973 S.W.2d 250, 255 (Tenn. Crim. App. 1997). Therefore, using the trial court's previous sentencing determination as guidance, we impose the maximum sentence of four years for this Class D felony. See, e.g., Edward Joseph Benesch II, 2017 WL 3670196 at *19 (imposing a sentence of four years for the modified conviction because the trial court imposed the maximum sentence for each of the defendant's other convictions); State v. Daniel O'Sicky, No. E2010-02439-CCA-R3-CD, 2011 WL 3371486, at *7 (Tenn. Crim. App. Aug. 5, 2011) (imposing a sentence of six years for the modified conviction because the trial court imposed the maximum sentence for each of the defendant's other convictions). Accordingly, we remand for modification of the judgment form to reflect a sentence of four years for reckless homicide in Count 2.

## II. Double Jeopardy / Merger

The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. Article I, section 10 of the Tennessee Constitution similarly provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb." Our supreme court has recognized that the Double Jeopardy Clause provides three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). This case involves the last of these three categories.

"In single prosecutions, multiple punishment claims ordinarily fall into one of two categories . . . referred to as 'unit-of-prosecution' and 'multiple description' claims." Id. at 543. "[M]ultiple description claims arise when a defendant who has been convicted of multiple criminal offenses under different statutes alleges that the statutes punish the same offense." State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing Watkins, 362

S.W.3d at 544).  By contrast, unit-of-prosecution claims arise "when defendants who have been convicted of multiple violations of the <u>same</u> statute assert that the multiple convictions are for the 'same offense.'"  <u>Watkins</u>, 362 S.W.3d at 543.  The Defendant's assertions in this case present multiple description claims.

In <u>Watkins</u>, the Tennessee Supreme Court abandoned the <u>State v. Denton</u>, 938 S.W.2d 373 (Tenn. 1996), four-factor test previously employed by Tennessee courts in determining whether dual convictions violate the prohibition against double jeopardy.  Instead, for multiple description claims, the court adopted the same elements test enunciated by the United States Supreme Court in <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932).  <u>Watkins</u>, 362 S.W.3d at 556.  Under the <u>Blockburger</u> test, the first step is to determine whether the convictions arise from the same act or transaction.  <u>Watkins</u>, 362 S.W.3d at 545.  If the convictions arose from the same act or transaction, the court must then determine whether the legislature intended to allow the offenses to be punished separately.  <u>Id.</u>  When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense.  <u>Id.</u>  If each offense contains an element that the other offense does not, the statutes do not violate double jeopardy.  <u>Id.</u> at 545-46.

Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness.  <u>Smith</u>, 436 S.W.3d at 766 (citing <u>State v. Thompson</u>, 285 S.W.3d 840, 846 (Tenn. 2009)).

### A.  Second Degree Murder and Voluntary Manslaughter

The Defendant argues that his convictions for second degree murder and voluntary manslaughter violate double jeopardy.  He claims that Counts 2 and 4 of the indictment charged him with alternate theories of felony murder, the killing of the victim in the perpetration or attempt to perpetrate, respectively, aggravated child abuse, and aggravated child neglect, and that double jeopardy bars "dual convictions for alternative theories of felony murder."  He therefore asserts that the two convictions should be merged.

Although we have modified the Defendant's conviction for voluntary manslaughter into a conviction for reckless homicide, the Defendant's assertion that the convictions in Counts 2 and 4 should merge is still correct.  <u>See</u> <u>State v. Berry</u>, 503 S.W.3d 360, 362 (Tenn. 2015).  Even though the judgments do not reflect such, however, the transcript of the sentencing hearing indicates that the trial court in fact merged these two convictions.  Therefore, we remand for entry of corrected judgments indicating merger of the Defendant's reckless homicide conviction into his second degree murder conviction pursuant to the guidelines provided in <u>Berry</u>.  <u>Id.</u> at 364.

- 14 -

## B. Aggravated Child Abuse, Neglect and Endangerment

The Defendant argues that his convictions for aggravated child abuse, aggravated child neglect and aggravated child endangerment should be merged into a single count of aggravated child abuse. He asserts that those "three counts of the indictment reflect alternate theories for the aggravating factor: that the victim received serious bodily injury." The State asserts that "each of the convictions represent separate and distinct offenses by the [D]efendant."

Under the previous version of the statute, aggravated child abuse and neglect was a single offense committed in one of two ways – through injury or neglect. See State v. Mateyko, 53 S.W.3d 666, 668 n.1 (Tenn. 2001). However, an amendment to Tennessee Code Annotated section 39-15-402 established aggravated child abuse and aggravated child neglect as separate and distinct offenses. See State v. Dorantes, 331 S.W.3d 370, 385 n.15 (Tenn. 2011). "[C]hild endangerment" is also designated as a separate offense under Tennessee Code section 39-15-401(c) and 39-15-402(a). As we addressed in detail regarding the sufficiency of the evidence, the Defendant's convictions for aggravated child abuse and aggravated child neglect were based on different actions or inactions on the Defendant's part. Accordingly, there is no double jeopardy issue and merger of these two convictions is not required. The Defendant's double jeopardy allegation is moot regarding his conviction for aggravated child endangerment in light of our determination that there is insufficient evidence to sustain that conviction. However, in the event a reviewing court were to determine there was sufficient evidence to sustain the conviction for aggravated child endangerment, then that conviction would be based on yet another distinct action or inaction and merger would not be required.

## III. Sentencing

The Defendant lastly challenges the trial court's imposition of partial consecutive sentences. He asserts that the court erred in finding that he had an extensive criminal record and considering a non-statutory factor, namely the facts of the case.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Id. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Accordingly, we review the length of the sentences ordered by the trial court under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. We, similarly, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in Bise, 380 S.W.3d at 707, to the trial court's consecutive sentencing decisions).

A trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including that the defendant is an offender whose record of criminal activity is extensive. Id. § 40-35-115(b)(2).

It was established at the sentencing hearing that the Defendant had prior convictions for attempted statutory rape, statutory rape, criminal trespass and unlawful possession of a weapon. The trial court, considering both the Defendant's previous convictions and current convictions, found that he possessed an extensive history of criminal activity. The court imposed a twenty-five year sentence on Count 1 (aggravated child abuse); a six year sentence on Count 2 (voluntary manslaughter); a twenty-five year sentence on Count 3 (aggravated child neglect); a twenty-five year sentence on Count 4 (second degree murder); and a twenty-five year sentence on Count 5 (aggravated child endangerment). The court ordered that Counts 1, 3 and 5 run concurrently to each other. The court orally merged the voluntary manslaughter conviction in Count 2 into the second degree murder conviction in Count 4 and ordered that the resultant twenty-five year sentence run consecutively to the twenty-five year sentence from Counts 1, 3 and 5, for an effective sentence of fifty years.

The Defendant contends that the trial court erred in relying on the extensive record of criminal activity factor in imposing consecutive sentences. However, in addition to the prior criminal convictions listed in his presentence report, the Defendant stands presently convicted of four offenses after our reversal of his aggravated child endangerment conviction. This court has held that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing." State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)); see, e.g., State v. David Richardson, No. W2016-00174-CCA-R3-CD, 2017 WL 401368, at *9 (Tenn. Crim. App. Jan. 27, 2017), perm. app. denied (Tenn. May 24, 2017); State v. Kyle Ronald Fencl, No. M2012-01265-CCA-R3-CD, 2013 WL 3976060, at *8 (Tenn. Crim. App. Aug. 5, 2013), perm. app. denied (Tenn. Nov. 13, 2013). The Defendant's complaint that the trial court considered the "non-statutory factor" of the facts of the case is of no consequence as the trial court's reliance on the Defendant's record of criminal activity is alone sufficient to support imposition of consecutive sentences. The trial court did not abuse its discretion.

## CONCLUSION

Based on the foregoing authorities and reasoning, we modify the Defendant's conviction for voluntary manslaughter in Count 2 to reckless endangerment and impose a sentence of four years for that conviction, the judgment of which should indicate the merger of Count 2 into Count 4; reverse the Defendant's conviction for aggravated child endangerment in Count 5; and remand for entry of a corrected judgment in Count 4 to indicate the merger of Count 2 into Count 4. We affirm the trial court's judgments in all other regards.

_____
ALAN E. GLENN, JUDGE

- 17 -